JOHN B. GONTRUM, INSURANCE COMMISSIONER
*v.* UNION LIBERTY LIFE INSURANCE
COMPANY, INC.

[No. 24, January Term, 1940.]

■■■■■■■■■■■■■■■■

*Decided March 5th, 1940.*

■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■    ■■■■■■■■

The cause was argued before BOND, C. J., OFFUTT, MITCHELL, JOHNSON, and DELAPLAINE, JJ.

*William C. Walsh, Attorney General,* and *H. Vernon Eney, Assistant Attorney General,* with whom was *William L. Henderson, Deputy Attorney General,* on the brief, for the appellant.

*Max Sokol* and *M. William Adelson,* with whom were *Deely K. Nice* and *Dickerson, Nice & Sokol* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The Union Liberty Life Insurance Company, appellee, was incorporated on April 7th, 1938, to continue an industrial life insurance business theretofore carried on by the Royal Life Insurance Company of America, which will herein be called the Royal Company, which appears to have been in business prior to 1914 A. D. The Royal Company was placed in the hands of a receiver in 1936 in a proceeding instituted by the Attorney General on behalf of the Insurance Commissioner of Maryland and, while it was in process of liquidation, on March 23rd, 1938, the receiver received from R. F. Holman and D. W. Darden, an offer of $2000 for its "Charter," subject to the condition that the "Charter shall be put in full force and effect in the State of Maryland." To that offer, on March 24th, 1938, the Insurance Commissioner replied: —"After due consideration, the above offer is accepted. After the sale of this charter shall have been reported to and ratified by the Court, it will be duly assigned and

delivered to your clients. As Insurance Commissioner, license will be duly granted to a newly organized company under this charter to transact an Industrial life, health and accident insurance business in Maryland when applied for, provided said newly organized company shall be found to be possessed of the capital and assets required of such company under its charter, and shall otherwise comply with the requirements of its charter under the statutes of this State." Prior to that, on February 18th, 1938, the Circuit Court of Baltimore City, in which the receivership proceedings were pending, authorized the receiver to sell "the Charter" of the Royal Company for such sum "as may be procurable." On April 5th, 1938, that order was amended so as to authorize the receiver to sell "the Charter of the Royal Life Insurance Company of America with all rights, privileges and franchises existing thereunder, to such person, persons or body corporate as he may deem proper, for such sum or sums of money as may be procurable, and the proceeds deposited in bank, subject to the further order of this Court. Otherwise said original order is hereby confirmed."

The receiver, on April 7th, 1938, reported that he had sold the "Charter" of the Royal Company "with all rights, privileges and franchises existing thereunder, unto Roland F. Holman, David W. Darden and Carl J. Kirby" for $2000, and on the same day the sale was confirmed. The purchase price was paid and the purchasers thereupon caused the Union Liberty Life Insurance Company, Inc., herein called the Union Company, to be incorporated, and thereafter they attempted to transfer to it the charter, rights, privileges and franchises of the Royal Company which they had bought from the receiver. The Union Company then deposited with the Insurance Commissioner $10,000 in U. S. Government bonds and applied for a certificate authorizing it to operate an industrial life insurance business in Maryland, and was informed by the State Insurance Department of Maryland that, as soon as its policy forms were approved by

W. S. Hanna, the Insurance Commissioner, a license to sell insurance in accordance with the provisions of the "Charter of the Royal Life Insurance Company of America" would be issued to it. The forms were filed and approved, but Mr. John B. Gontrum, who had succeeded Mr. Hanna as Insurance Commissioner, would not issue the certificate unless the Union Company deposited with him $50,000, as required by Code, art. 48A, sec. 98. The matter was then referred to the Attorney General, who advised the Insurance Commissioner that no certificate to do business should be issued to the Union Company until it had complied with the requirements of Code, art. 48A, sec. 98. The Union Company thereupon brought this action for a mandamus to compel the Insurance Commissioner to issue the certificate. The case was submitted to the court on pleadings embodying the facts stated, and the court, after a hearing, ordered the Insurance Commissioner to issue to the Union Company a license or certificate authorizing it to do an industrial insurance business in the State of Maryland. The appeal is from that order.

The question presented by the appeal is a narrow one, and is, had the receiver the power to transfer to the appellee the privilege of the Royal Company to do an industrial life insurance business in Maryland upon depositing $10,000 with the Insurance Commissioner, as required by Code, art. 48A, sec. 100, or was it required, as a condition precedent to doing such a business, to deposit $50,000 with the Commissioner, as provided in Code, art. 48A, sec. 98? That question turns upon whether the power which the Royal Company had and exercised of doing such a business under Code, art. 48A, sec. 100, rather than under Code, art. 48A, sec. 98, could be transferred to a new corporation under the provisions of Code, art. 23, sec. 134.

In considering the meaning and significance of these statutes, reference to the evolution and history of the statutory law affecting the business of industrial life insurance in this state may be helpful.

Industrial insurance, or as it is sometimes called, people's insurance, prudential insurance, or family insurance, is said to have originated in the early guilds, friendly societies, and burial societies. *Couch, Encyc. Insurance Law,* sec. 32; 17 *Halsbury's Laws of England* (Hailsham's Ed.) sec. 431 *et seq.,* 509; 31 *C. J.* 966; 18 *Halsbury's Laws of England* (Hailsham's Ed.) 574. It is a form of insurance written for a small limited amount payable at death, in consideration of a premium collected at short, fixed, intervals, and is not unlike burial insurance, or death benefits, since its benefits ordinarily accrue to the insured rather than to another. Because of the small amounts for which it is written, it is ordinarily sold to persons of limited means and thin resources, and in the beginning was issued by guilds and friendly societies for the mutual protection of their members, and payments accruing under it were made from dues and assessments imposed upon the members, and its purpose was protection and not profit. But its nature and character began early to be affected by the motive of profit, and that change so influenced its development that today the business is largely done by stock companies operating for profit, although in other respects it retains the characteristics which gave it its name. Coincident with that change in its nature came also the necessity of regulating it by statute, in order that the poor and needy, who often look to it as their only assurance of a decent burial or help in time of sickness, might receive the benefit for which they paid.

Chapter 106 of the Acts of 1878 established for the first time in this state a State Insurance Department, created the office of Insurance Commissioner, and prohibited any person from acting as agent or solicitor for any insurance company until it obtained a license from the commissioner and satisfied the insurance department that it maintained reserves adequate for the protection of its policy holders. Chapter 387 of the Acts of 1880, section 32, amended the Act of 1878 so as to define "insurance company," and in that definition it excluded from

the term religious, charitable, benevolent societies, and orders or associations having ritualistic work. Chapter 424 of the Acts of 1888 again amended section 32, chapter 106, Acts of 1878, by adding to the definition the following proviso: "Provided, also, that the business commonly known as industrial insurance, or on the weekly-payment plan, shall not be permitted to operate under the guise or privileges of the orders as exempted in this act," so that inferentially such organizations were brought within the scope of existing insurance legislation. Sub-section A of section 32 also provided "that weekly collection or industrial benefit societies of this state, granting insurance of five hundred dollars or less, may only be required to have and maintain the sum of five hundred dollars," and sub-section G required such organizations to require their agents to give a bond for not less than fifty dollars. It may be inferred also from that act that such companies had not theretofore been regarded, or at least treated, as within the insurance laws of the state, but beginning with its passage they were subjected to those laws and dealt with accordingly. Chapter 488 of the Acts of 1892 carried the regulation of such companies a step farther, and provided that they might be formed on the "mutual, corporative assessment or stock plan," but that if formed on the stock plan they must have a paid up capital of $10,000, and must deposit with the Commissioner $10,000 in cash or its equivalent, but it further provided that weekly or monthly collection or industrial benefit societies incorporated prior to 1892, and which had reported to the Commissioner for 1891, need only deposit "the sum of five hundred dollars ($500), before the first day of January, 1893, and to deposit as aforesaid an additional sum of five hundred dollars ($500), before the first day of January in every year thereafter until they shall have each deposited as aforesaid the full sum of ten thousand dollars ($10,000)," The law was again amended by chapter 256 of the Acts of 1894, which provided that weekly or monthly collection or industrial benefit societies, incorporated prior to 1892

and which made a report to the Commissioner for the year 1891, would only be required to deposit with the Commissioner $500 annually until the accumulated deposits equaled $10,000, but that if any such company failed to make the deposit it should be subject to the penalty and process imposed by Code 1888, art. 23, sec. 122.

So much of chapter 338, Acts of 1902, as relates to industrial insurance companies, is ambiguous, but its apparent purpose was to continue the policy of permitting industrial insurance companies, which were incorporated and doing business prior to 1898, to continue in business upon compliance with the milder terms of what is now Code, art. 48A, sec. 100, rather than with the more stringent provisions of what is now section 98 of that article.

Chapter 813 of the Acts of 1914 again amended the law, then codified as sections 175 and 176, Code, article 23, and provided that no such company issuing policies or contracts of insurance for the payment of no more than $1000, if formed on the stock plan, might operate unless it had a paid up capital of a least $50,000, and if formed on the mutual, co-operative assessment, or stock plan, until it had deposited with the Commissioner $50,000, but that mutual or co-operative assessment companies, organized and operating prior to January 1st, 1914, having a *bona fide* membership of not less than five hundred, which converted the organization into a stock company prior to July 1st, 1915, might have a paid up capital of less 'than $50,000, but not less than $10,000, but that companies having capital stock so limited might not issue certificates for more than $500. Chapter 133, Acts of 1916, extended the time of conversion to July 1st, 1916. Then by chapter 492 of the Acts of 1922 the insurance sections of Code, art. 23, were repealed, re-enacted and consolidated in a new article known as article 48A. In that codification the provisions of the insurance law relating to industrial insurance companies converted prior to July 1st, 1916, and operating prior to 1914, are found

in sections 21 and 97, which limited the amount payable upon any policy to $500, and permitted the licensing of such companies as had a capital stock of more than $10,000 but less than $50,000, upon the deposit of $10,000 with the Commissioner, and, except that chapter 313, Acts 1927, enlarged the amount for which policies might be written to $1000, that is the law today.

Interesting historical sidelights upon the conditions attending the legislation affecting the business of industrial insurance are said to be found in the Insurance Commissioner reports, but as they are not in evidence they cannot be considered. It is, however, apparent from a consideration of the legislation itself that running through it all there is a constant purpose of protecting the beneficiaries in the policies issued by companies doing that business. At first, when they operated on a mutual or co-operative assessment plan, the insurers and the insured were identical, and the motive of profit was absent, self-interest might be expected to insure so much vigilance and supervision by the members as would insure a reasonable degree of honesty and good judgment in its operation, and the need for regulation was less. But when they were converted into money making organizations, and the business transferred to corporations over which the beneficiaries had no control, the situation was different. There was then no reason for the State to devise ways of protecting the companies, for they could be expected to protect themselves, but there was every reason for it to protect the beneficiaries named in their policies, for they would otherwise be without protection. So that, in construing the statutes under consideration, it must be remembered that their purpose was to protect the beneficiaries under policies issued by such companies, not to favor the companies.

Turning now to the immediate question, it is indisputable that the receiver had no right to sell the "charter" of the Royal Company. Unless expressly authorized by the legislature, the "charter" of a corporation cannot be bought or sold. For, as stated in 13 *Am. Jur.*

216: "The franchise of becoming and being a corporation is in its nature incommunicable by the acts of the parties and incapable of passing by assignment. The franchise to be a corporation clearly cannot be transferred by any corporate body of its own will. Such a franchise is not in its nature transmissible. The franchise to be a corporation is, therefore, not a subject of sale and transfer, unless the law by some positive provision has made it so and pointed out the modes in which such sale and transfer may be effected. The right to. be a corporation or the corporate right of life is inseparable from the corporation itself. It is part of it and cannot be sold or assigned. That franchise is general and dies with the corporation, for it cannot survive dissolution or repeal." *Fletcher, Cyc. Corp.* sec. 1224. Corporate franchises are said to be severable into three classes, one including the right to exist as a corporation, two, the right to do business as a corporation, and three, the right, peculiar to the corporation, and not possessed by the general public, of doing particular acts or things in the transaction of that business. *Ibid.* 214. Not only may corporations not transfer franchises of the first or second class without legislative sanction, but the weight of authority supports the view that they may not transfer any franchise affected with a public interest without such approval. *Ibid,* sec. 1225.

The question here then is, was the power of the Royal Company to do business under the provisions of Code, art. 48A, sec. 100, transferable, or, in other words, is that power a right, privilege or franchise within the meaning of Code, art. 23, sec. 134?

It is clear that, as used in that section, the term franchise was not intended to include the right to exist as a corporation, because it contemplates, as a condition precedent to the power to transfer, the formation of a new corporation independent of and distinct from the old corporation, and it is consistent with its terms that the transfer will not affect the existence of the old corporation. But it did nevertheless include the secondary

franchises of the old corporation, and as well its rights and privileges. Now it is true that the reason which led the Legislature, to classify small, industrial insurance companies separately, and to permit them to do business with less capital, and required them to make. a smaller deposit than larger corporations, was the apprehension that any more onerous requirements might result in their liquidation, with consequent loss to their policy holders, and it is also true that that reason does not apply to such a case as this, because here the company is in process of liquidation, and its creditors will derive little, if any, benefit from the transmission of the powers of the old corporation to the new one. But that does not control the question here. Code, art. 23, sec. 134, refers not to insurance companies alone, but to all corporations, since it applies specifically to "any corporation of this State," so, that its benefits necessarily extend to the Royal corporation as well as to all others. That section also provides for the "continuation, operation, ownership and management" of "any corporation" by a new corporation formed for that purpose by the purchasers of the "franchises and property" of the old corporation.

Manifestly, the new corporation could not continue the business of the old corporation if it were subjected to exactions new as to it and not required of the old corporation, which might make its operation impossible. For many years the State has recognized that the smaller companies served a need, and that in many cases subjection to the stringent requirements applicable to the larger companies would prevent their continuation. Therefore it did two things, first, it classified them according to the amount of the insurance which they were authorized to write on a single life or group of lives, and it permitted them to do business within that limit upon a smaller capital and upon a smaller deposit than the larger companies; then it provided that companies organized after a certain date would be subjected to the more stringent provisions of the general law. Whether that grant was a franchise is a mere verbal nicety, since

it was certainly a privilege, and as a privilege came within the direct terms of the statute, just as a franchise would. We are not dealing here with the power of the Legislature to increase the amount of the deposit required of such companies, or its power to otherwise regulate them in the public interest, for that is not denied, but with the extent of a grant which it has already made and has not withdrawn. And, unless the language of the enactment is given a meaning wholly unwarranted by the words employed, it must follow that the Union Company comes under the provisions of Code, Art. 48A, sec. 100, rather than under those of section 98.

Cases relating to exemption from taxation, relied upon by the appellant, are not in point, since here is no actual analogy between an exemption of that character and a grant of power, since the one is a waiver and the other a grant. Nor is there any substantial support for the suggestion that the privilege is not a grant of power but an exemption from compliance with the provisions of Code, art. 48A, sec. 98. Section 98 creates one class of industrial insurance companies, and grants to them the privilege or right of doing business upon terms specified in it. Section 100 creates another class of industrial insurance companies and permits them to do business upon other and different terms. The subject of each section is a grant, not an exemption.

The *in terrorem* suggestion that if it be held that the right to do business under Code, art. 48A, sec. 100, is a franchise, right, or privilege, then under Code, art. 23, secs. 9 and 36, any corporation operating under that section may transfer to any other corporation "the right and privilege" of doing business thereunder, has little force. If it is meant that the corporation could not only grant the right but could continue to exercise it itself after the grant, it is enough to say that no language contained in Code, art. 23, secs. 9, 36, permits such an inference. If it is meant that those sections permit such a corporation to transfer that privilege as a part of a transfer of "all of its property and assets as an entirety"

636

to another corporation, even if such a right existed, and that question is not decided because it is not in the case, it would in effect mean no more than continuing the same business under a different name, and, would not aggravate the evil, if evil there is, of. permitting such companies to operate at all, and since the policy of the State, expressed by the Legislature, is to permit them to exist, and operate, the possibility that the construction here given to Code, art. 48A, sec. 100, would lead to a construction of Code, art. 23, secs. 9, 36, which would give to such corporations the right to voluntarily alien their right to do business under article 48A, section 100, presents no difficulty. The court here is dealing with the meaning of article 48A, section 100, and article 23, section 134, which is a judicial. question, not with whether those provisions were wise, or unwise, which is a legislative question. If the construction given article 48A, section 100, leads to the suggested construction of Code, article 23, sections 9, 36, the Legislature must be presumed to have known that, and with that knowledge to have adopted article 48A, section 100, while it permitted the clear, positive and unequivocal language of article 23, section 134, to remain unchanged.

It follows that the order from which this appeal was taken was properly passed and must be affirmed.

*Order affirmed, with costs.*