GEORGE W. MILLER *v.* JOHN H. MILLER

[No. 127, October Term, 1946.]

*Decided June 11, 1947.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Abram C. Joseph,* with whom was *Murray MacNabb* on the brief, for the appellant.

*Edward L. Ward* and *Samuel K. Dennis* for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal by plaintiff from a decree dismissing his bill against his brother (defendant, appellee) for an accounting for profits from the sale of 2,264 shares ($5 par) of the stock of Star Life Insurance Company, which until December 18, 1931, were owned

by plaintiff and since May 4, 1933, had been held by defendant, plaintiff says as pledgee for indebtedness from plaintiff, defendant says as owner by purchase from two other brothers, Fadeley (now dead) and Allen. Judge Niles, quoting plaintiff's counsel, says the case boils down to one question: Was this stock purchased by defendant, or was it pledged to defendant? This question involves the same question as between plaintiff and Fadeley and Allen, *viz.*, was plaintiff's stock pledged or sold by plaintiff to Fadeley and Allen on December 18, 1931?

Plaintiff, 68, and defendant, 66 (who for two or three years has suffered from a "blood clot"), are the oldest of six brothers. The others were Daniel, Ezra (now dead), Fadeley and Allen, 50. The six were farm boys reared in southwestern Virginia; eventually all came to Baltimore. In 1908 plaintiff became the first president of a small mutual insurance society incorporated in Maryland. In 1912 the mutual company was changed to a stock company with $25,000 capital stock; it changed its name to Star Life Insurance Company, and continued the "industrial" insurance business. A few years later statutory requirements of larger capitalization and deposits with the Insurance Commissioner, for new companies, created a special value of stock or "charters" of such old corporations, which in at least one instance even survived insolvency. *Gontrum v. Union Liberty Life Ins. Co.*, 177 Md. 624, 631, 632, 11 A. 2d 625. Plaintiff was president until December 8, 1931, when he retired and Ezra was elected president. At that time plaintiff was indebted to the company on a note; after payment of $7,000 this indebtedness, with interest, amounted to about $5,500 in January, 1933. On February 2, 1932, plaintiff's resignation as director was accepted by a vote of four to two, plaintiff and defendant voting in the negative. The same day, by the same vote, a ten-year contract of employment between the company and Fadeley and Allen was ratified. At December 31, 1930, the company had shown a deficit

of $39,581.97, and at December 31, 1931, 1932, 1933, 1934 and 1935, showed deficits of $38,460.28, $18,615.93, $12,097.95, $9,466.03, and $8,111.65 respectively. About 1930 a representative of the State Insurance Department became a director, and salaries were cut about fifty per cent.; this director continued as such until 1940, when the company had a surplus of about $14,000. This surplus was established in part by contributions ("some, but very few") from stockholders. Defendant and his wife say they mortgaged their house for $5,000 in 1939 for money the Insurance Department required "to be put up." The company never paid a dividend from 1908 to 1945, when all its shares of stock were sold to Progressive Quaker City Life Insurance Company for $365,000, which yielded $67.88 per share, net after expenses, to its stockholders. During the war the company prospered through prosperity of low-income workers, from whom it got its business.

From time to time, if not all at the same time, the six brothers were stockholders, directors, officers or employees of the company. Before December 18, 1931, plaintiff held 2,264 shares, defendant 500, and Daniel and Ezra each 1,100 out of the 5,000 shares. On January 27, 1932, a ten-year voting trust agreement was entered into between Daniel and Ezra and Fadeley and Allen, covering all these 4,964 shares except defendant's 500. On May 11, 1934, this voting trust agreement was cancelled and a new one executed between Daniel and Ezra and defendant, for the unexpired term of the old one, covering all these 4,964 shares. After December 18, 1931, plaintiff received about two weekly salary payments and no more until May, 1934. From May, 1934, until the expiration of the voting trust on January 27, 1942, plaintiff received a salary of $70 semi-monthly as second vice-president; he had no authority to bind the company upon any agreement or in any manner. After January 27, 1942, he received no compensation from the company.

Judge Niles, at the outset of his opinion, says: "Before deciding the merits of the case, the court cannot refrain from observing that all of these brothers seemed to treat this company as a private source for getting themselves on the payroll, and that that is the spirit in which they seem to have dealt with the stock and with each other." We think there is also ground for a comment by counsel, that none got much salary but it is doubtful whether they were worth much.

Before December 18, 1931, plaintiff owed to Equitable Trust Company $1,200, secured by 264 shares of Star stock and other collateral, and to Union Trust Company $3,400, due December 27, 1931, secured by his remaining 2,000 shares. He was without means to pay his Union Trust note at maturity. On December 18, 1931, his note at Equitable was paid, and that at Union paid or assumed, by Fadeley and Allen, his stock from Equitable was delivered to them and by them to Union, and his other Equitable collateral was returned to him. On December 20, 1931, all the 2,264 shares were transferred of record into the names of Fadeley and Allen and continued to be held by Union as collateral. Plaintiff's version of these transactions is that Fadeley and Allen (a) offered and agreed to "take up" plaintiff's loans, in order to avoid sacrifice of his stock at forced sale, by arranging for the "transfer" of the $3,400 loan to their loan account with Union, for payment of the $1,200 Equitable loan and transfer of the stock held by Equitable to their Union account, and for repayment of the loans by plaintiff to them in small amounts of $200 or more a month, and (b) carried out their offer and agreement on December 18, 1931, but later, in February, March and April, 1932, refused offers by plaintiff to pay $200 on account of his loan. Fadeley and Allen's version was, and defendant's conteniton is, that on December 18, 1931, at plaintiff's request Fadeley and Allen purchased outright plaintiff's 2,264 shares for $4,700—$100 more than plaintiff's loans from Equitable and Union—by obtaining a new loan of $3,500 from

Union, secured by the 2,264 shares, and paying for the shares (i) by a check for $3,500 to plaintiff, out of which plaintiff paid his $3,400 loan from Union and thereby released 2,000 of the shares sold, and (ii) by a check for $1,200 to Equitable, whereby the other 264 shares were released to Fadeley and Allen and the other collateral was returned to plaintiff.

Plaintiff consulted his lawyer, Mr. James S. Pennington, who told him he needed a more experienced lawyer and introduced him to Mr. Edward L. Ward. Mr. Pennington left during plaintiff's first conference with Mr. Ward and, though nominally associated with Mr. Ward in plaintiff's business, took little active part and knows little about details. He received $250 out of a fee of $1,000 ultimately received by Mr. Ward from plaintiff for services in a suit against Fadeley and Allen and in two other unrelated matters. On July 2, 1932, plaintiff, through counsel, demanded of Fadeley and Allen return of the 2,264 shares and "tendered himself as ready and willing" to pay his alleged loans of $3,400 and $1,200. This demand was refused.

On October 26, 1932, plaintiff filed a bill against Fadeley and Allen (a) for return of the 2,264 shares upon payment by plaintiff of his alleged loans with interest, and (b) for a "credit upon said loans" of all weekly payments of $50 each to Fadeley and Allen by the company under their employment contract. Fadeley and Allen answered through the late Edward J. Colgan, denying plaintiff's verson of the transactions between them, stating their own version, and alleging *inter alia* that: Plaintiff had repeatedly asked them to advance him money for discharge of his two notes and to hold his 2,264 shares, in their names, until plaintiff should get a discharge in bankruptcy; they refused to be parties to any such proceeding, but suggested that they might buy his shares outright; again, at the office of their counsel, Mr. Earl W. Blackburn, plaintiff proposed an arrangement whereby his stock could, in some manner, be concealed until after he had got rid of his

creditors; Mr. Blackburn "condemned this project," and eventually an outright purchase was agreed upon and consummated. Mr. Ward testifies that after this answer was filed he felt that, with three reputable witnesses against plaintiff, plaintiff's case was hopeless; he tried to get a settlement. Through Mr. Colgan he got an offer from Fadeley and Allen to take $5,000 for the 2,264 shares, plus $10,000 if the shares were resold within three years. Mr. Ward had four conferences at his office with plaintiff and defendant (whom plaintiff introduced to him) and their respective wives. He says he reported Mr. Colgan's offer and asked plaintiff if he could buy the stock. At the next conference plaintiff said it was impossible for him to raise the money. Mr. Ward then asked defendant if he could buy it. At the third conference defendant asked Mr. Ward what he thought about it; Mr. Ward said, for reasons stated, he thought it would probably be worth while for defendant to buy. At the fourth conference defendant said he would buy it. The case was set for trial on April 12, 1933, but on that day was evidently passed for settlement. In January, 1933, the company had brought suit against plaintiff for the $5,500 then due on his note.

There were executed, dated May 4, 1933, (1) a release from plaintiff to Fadeley and Allen from all claims by reason of anything "arising out of and in connection with the purchase, ownership or subsequent sale of 2,264 shares" of Star stock, (2) an agreement between Fadeley and Allen and defendant, whereby they sold to him 2,264 shares of Star stock for (a) $5,000 in cash (which he then paid) and (b) $10,000 additional if he should sell the stock within three years, and (3) a power of attorney from defendant to Mr. Colgan and Mr. Ward, irrevocable for three years, to sell for him the 2,764 shares (500 plus 2,264) "owned" by him "at such price as they may determine" and to take action to have the voting trust dated January 27, 1932, declared invalid. The stock certificates, assigned in blank, were delivered to defendant but were not transferred of

record until May 11, 1934. On December 4, 1933, defendant, through Mr. Ward, brought suit to set aside the voting trust. On May 3, 1934, Ezra and Daniel and defendant executed an agreement, reciting the voting trust suit and an agreement to settle that litigation and other related matters, and providing that (a) the voting trust agreement should be annulled, and a new one entered into for the unexpired term of the old, Ezra, Daniel and defendant to be the trustees, their "stock ownership" being respectively 1,100, 1,100 and 2,764 shares; (b) the trustees should be authorized to sell the capital stock of the parties for not less than $30 per share; (c) plaintiff should be made a second vice-president with the salary, during the term, and under the restrictions above stated; (d) if possible, Fadeley and Allen's ten-year employment contract should be purchased and annulled; (e) defendant should get an increase of $10 a week in salary, and any future increases or decreases in salaries of Ezra, Daniel and defendant should be in proportion to their existing salaries. Plaintiff says he saw this agreement of May 3, 1934, about three to five years thereafter. On May 11, 1934, the new voting trust agreement was executed. On May 17, 1934, the company's suit against plaintiff was entered settled.

In October, 1934, plaintiff and his wife, on voluntary petitions, were adjudicated bankrupts. Plaintiff filed schedules showing total assets of $250 and liabilities of $47,771.49, including a note to defendant for $1,853, dated May 27, 1934, but not including the $5,000 paid by defendant to "take up" the stock for plaintiff (or buy it from Fadeley and Allen) or any expenses in connection therewith. His schedules were prepared for him by Mr. George Thomas, then a young lawyer connected with the Legal Aid Bureau. He told Mr. Thomas he had transferred his stock to one of his brothers, to be held "more or less in trust" and ultimately returned to him, but the brother had refused to return it or to acknowledge any agreement to do so. He thought defendant would give him a letter, which however was not forthcoming.

In the absence of any trustee's certificate or any letter or evidence of any such agreement, and also in view of the company's supposedly precarious condition, Mr. Thomas concluded not to list the stock as an asset—though he listed other worthless stock. Mr. Thomas does not recall that plaintiff told him of the payments by Fadeley and Allen, the litigation against them, the payment of $5,000 for the stock by defendant or the voting trust litigation or settlement. In 1943 plaintiff's trustee in bankruptcy reported a recent claim by plaintiff of an interest in the stock at the time of bankruptcy and, in in view of the apparent lack of equity in the stock at that time and the present denial of any such interest by defendant, asked instructions, and was authorized by Judge Coleman to abandon to plaintiff any claim against defendant. With the trustee's petition was filed a sworn statement of plaintiff, setting forth the company's deficits from 1930 to 1935, his version of the Fadeley and Allen transactions, litigation and "settlement" in 1933, the voting trust litigation and "settlement" in 1933 and 1934, defendant's alleged agreement in 1933 to "advance the money needed to effect the settlement for me" and to "hold the stock until I was in a position to repay him," alleged advice by defendant to "stay in the background" during the 1934 settlement because "Daniel and Ezra were bitter towards me," and repudiation by defendant of his agreement when plaintiff made claim on him in January, 1942, upon expiration of the voting trust. Judge Niles regards "what was done at the time of the bankruptcy" as "a consideration of overwhelming consequence."

Plaintiff says, on August 25, 1933, he asked defendant what would be the principal and interest he would owe defendant at the end of the voting trust; defendant said he had a statement but no duplicate; plaintiff copied it; "then we figured what the interest would be"; "the interest payable at the end of the voting trust, together with all the items which I owed him, etc., was $11,320.00" [which is the par value of the 2,264 shares]. The paper

is in plaintiff's handwriting, much of it an almost illegible scrawl. It shows nine items (unrelated to the stock) amounting to $1,853.99 (defendant "said forget the 99 cents") *i. e.*, the amount scheduled in bankruptcy, and three items, "$5,000 for stock," "$500 to Ward" (Mr. Ward's fee in the voting trust litigation), and "$10 injunction against D. A. & E. C." [Daniel and Ezra] amounting to $5,510, not scheduled in bankruptcy, a total of "$7,365 [*sic*]. Amount Payable with interest to J. Miller to Redeem Stock 11,320.00 of Star Life which he helped us Prevent D. A. & E. C. from getting. G. W. Miller." "I was to Pay interest and Principal all over his Present Salary and what I could Pay if any was to Liquidate the $7,365.99. J. M. said forget the 99¢." The paper contains no computation of interest to any date, mentions no such date, and shows that "$11,320.00" was the par amount of the stock, not future principal and interest of a debt. Plaintiff and defendant both are in impaired health. This testimony by plaintiff concerning a paper written by him, to which he ascribes importance, illustrates the infirmity of memory and oral testimony after ten or fifteen years.

In a letter to plaintiff, dated August 10, 1933, from defendant and his wife, it is said, "I was to see Mr. Ward this evening and he has been trying to sell the stock. He said Clark [Ezra] and Dan had offered 25,000 for your share of the stock, but he did not except it, but he had thought of 35,000.00 for yours but I told him that we would not think of taking that. I told him we would hold it for the eight years and get it all rather than take that * * *. We have decided not to except any of there offers to purchase stock." Plaintiff says "your stock" is recognition of his ownership; defendant says it is descriptive (to distinguish the 2,264 from the 500) and historical, like "Napoleon's sword." In four letters from plaintiff to defendant in 1933 and 1934 plaintiff said (1) "Please do not under any circumstances let any Trust be made that would take a cent of your stock. Hold All." (2) "this vote Theft of My Life's savings the Star

Life Stock is not only destroying the health of Mabel and myself but it has a horable hurtful effect on our children," (3) referred to "such good proof of their purpose to vote me out and Starve us into Selling the Stock," (4) "They all know that you are now in the sadle." All four letters reflect plaintiff's intense desire to get back on the payroll, which defendant effected for him in May, 1934. Judge Niles says the letters (to and from plaintiff) "work both ways" and are "not conclusive."

In July, 1935, at plaintiff's request, Mr. Ward prepared for him a memorandum, for signature by defendant, reciting that defendant "purchased" from Fadeley and Allen the 2,264 shares which "had theretofore been owned by plaintiff" and defendant desires to give plaintiff "the right to repurchase said stock upon being paid the full amount of money that he has invested in said stock, and for costs and attorneys' fees in connection thereto, plus all interest thereon." Defendant never signed this memorandum.

After the termination of the voting trust, and of plaintiff's salary, in January, 1942, plaintiff asserted a right to "redeem" the stock, and defendant would not recognize any such right.

After the sale of all Star stock in February, 1945, the instant case was instituted on April 17, 1945. It was heard on the second amended bill, answer and voluminous evidence, and the bill was dismissed after an oral opinion. The details are different, but the basic question of fact is essentially the same as in the Fadeley and Allen case. That case was brought within a year after the alleged pledge, the instant case after almost twelve years. The defendant sets up the defenses of limitations and laches, which it will not be necessary to consider. We have read the testimony, relied on by the respective parties, of themselves, their wives and daughters and plaintiff's sister-in-law, but need not prolong this opinion by discussing it. We may assume, for sake of argument, that such testimony for

plaintiff, taken at par without comparing it with papers and records or considering inherent weaknesses such as lapse of time, supports his contention that the stock was pledged to defendant. Such testimony for defendant at least as strongly supports the opposite contention. We think papers and records and other testimony are free from conflict and more reliable.

Plaintiff bitterly assails Mr. Ward (1) for acting as counsel for defendant in acquiring the stock, while he was counsel for plaintiff in the case against Fadeley and Allen and (2) for playing the roles of both witness and trial counsel in the instant case. He contends that defendant and Mr. Ward occupied a confidential relation toward him, and defendant therefore has the burden of proof in the instant case. It is not clear whether the alleged abuse of confidential relations was (a) that Mr. Ward abandoned plaintiff for defendant or (b) that defendant seduced Mr. Ward from the path of duty. Presumably the latter is the charge, since Mr. Ward is not a party to the case and the consequence of the alleged abuse is put upon defendant. Whichever the charge, it is without factual basis. There was no conflict of interests between plaintiff and defendant in the litigation and settlements conducted for them in 1933 and 1934, no reason why they should not have the same lawyer, no concealment of the fact, and no obligation on the lawyer to foresee future strife between them. Plaintiff blamed Dan and Ezra for deposing him from office. He turned to Fadeley and Allen for help but soon found them in league with Dan and Ezra against him. He then appealed to defendant, his only other brother, to get him by votes and persuasion what he could not get himself by legal right—a place on the payroll, his major objective. Through Mr. Ward defendant obtained for him a virtual gratuity, in the guise of a "salary" without substantial services, which lasted almost eight years, undisturbed by his early bankruptcy. Mr. Ward also obtained dismissal of the company's suit against plain-

tiff. If anybody has ground to complain of the results obtained by Mr. Ward, it is not plaintiff but his creditors or the minority stockholders (holding 36 shares) of the company.

Defendant had not in fact any fiduciary relation toward plaintiff. If defendant's speculation in the stock had proved a losing venture, there might perhaps have been some color for complaint by him of bad advice from plaintiff's lawyer. In *Trossbach v. Trossbach,* 185 Md. 47, 42 A. 2d 905, 907, we refrained from deciding "whether a confidential relation exists when a country brother needs money and gets it from his city brother." The instant case is not even the case of the country mouse and the city mouse. After more than twenty years as president of the company, plaintiff (though not successful) was as experienced in business transactions as defendant or any of his other brothers. The evidence does not indicate that any of the six brothers put any special trust and confidence in each other, but suggests that they practically all distrusted each other, possibly not without cause.

No question of ethics or taste in combining the roles of witness and trial counsel is properly before us for decision as between plaintiff and defendant. If Mr. Ward had not been counsel in the instant case, his testimony would have been disinterested and practically conclusive. Tinged with bias of advocacy, his testimony may not be disinterested, but it is hardly less conclusive. Categorically and in detail he testifies that the stock was sold, not pledged, to defendant. On this question of fact he could not well be mistaken. His testimony is in accord with the papers and records. Judge Niles says the broad outlines of the case are: "That the papers made up in 1932, 1933 and 1934, are without any lack of uniformity in representing a sale; that there is no letter or reservation in writing, and that there is no statement of trust anywhere. The conduct of the parties is consistent with that interpretation, and in the bankruptcy schedules George swears to

that interpretation, or, more exactly, George told Mr. Thomas information from which Mr. Thomas drew the schedules that are wholly in accordance with that interpretation." We concur in these views and in the other views of Judge Niles previously quoted. In his opinion he does not mention Mr. Ward's oral testimony. We think his conclusion as to the ultimate fact at issue is inevitable, either without Mr. Ward's testimony, or almost from Mr. Ward's testimony alone, certainly from all the evidence.

*Decree affirmed, with costs.*